Church, Ch. J.
The principal question of law contested on the trial, and elaborately argued in this court, is, whether the relation of master and servant, or landlord and tenant, existed between the prisoner and the prosecutor, Mr. Son, in respect to the house occupied by "the former. Although not decisive of the guilt or innocence of the prisoner, the determination of the question had properly a material influence.
If the relation of master and servant existed it would follow that the legal possession of the house was in the prosecutor, and he had the legal right to remove the furniture and goods therein, and to employ the necessary force for- that purpose, and that the defendant would not be justified in using force to prevent it. And yet, if the acts of the prosecutor were of such a threatening character, by the use of a pistol or other deadly weapon, that the prisoner believed, and had reason to believe, that his life was in imminent danger, he might be justified in using the necessary means to avert it. On the other hand, if the prisoner was holding the house as a tenant, and had a lawful right to defend his possession, and his property, by the use of proper and necessary means, yet, if the force used was unnecessary or excessive, either in amount or the kind' of weapon employed under the circumstances presented, and after making due allowance for provocation and irritation, he might still be amenable to a criminal prosecution.
The court charged the jury that the prisoner occupied the house as a servant, and not as a tenant; and hence that the prosecutor had the legal possession.
The defendant stated the contract to be, that he was to work for Mr. Son a year at thirteen shillings a day, and have the use of the house he lived in and garden for that period. The prosecutor stated it substantially the same. He said: “ I made a bargain with him for a year, if he and I could agree, I was to pay him thirteen shillings a day, and he was to have *225 a house furnished him.” There was no dispute but that the defendant was to have the house in which he then resided. It does not appear whether the wages were less by reason of furnishing the house, or whether any or what allowance was intended on that account. Nor does it distinctly appear whether a residence in that particular house was necessary to the proper discharge of the duties of the defendant. If the occupation is connected with the service, or if it is required, expressly or impliedly, by the employer for the necessary or better performance of the service, then it is for his benefit, and he continues in possession. Such was clearly the case of Haywood v. Miller (3 Hill, 90), where a farmer hired a man and his wife to work a farm for wages. The occupation of the house was necessary to the performance of the service; and The People v. Annis (45 Barb., 304), was substantially the same, although I am unable to agree with the learned judge who delivered the opinion in that case, that immediately upon the termination of the service a tenancy at will, or by sufferance, springs up. In order to have that effect the occupancy must be sufficiently long to warrant an inference of consent to a different holding. Any considerable delay would be sufficient, but I can see no principle which would change the occupant eo instanti, from a mere licensee to a tenant. The employer should resume control of his property within a reasonable time or consent would be inferred. Whether this time is a day or a week may depend upon circumstances. In Doyle v. Gibbs (6 Lans., 180), the consent of the employer that the employed might remain until his wife recovered from an illness, Was held not to amount to a consent.
The circumstance that the right of occupation terminates with the abrogation of the contract of service, by consent or by the discharge of the servant, is not decisive. The question is, what was the character of the holding under the contract ? If that was a tenancy, then the party holding over would be a tenant at will, and the landlord would not be justified in entering with strong hand. So, while a deduction from wages of a specified sum for the use, or the absence of *226 such an arrangement, would be a material circumstance, it would not be in all cases conclusive either way. The question depends upon the nature of the holding, whether it is exclusive and independent of, and in no way connected with the service, or whether it is so connected, or is necessary for its performance. And this, I think, is the result of all the cases. The question has often arisen in England, under the poor laws, to determine what occupation would confer a settlement, the courts recognizing, as controlling the distinction between an occupation as a tenant or as a servant, (R, v. Minster, 3 M. & S., 276; R. v. Kelstern 5 id., 136; R. v. Chestnut, 1 B. & A., 473 ; R. v. Milkridge, 1 T. R., 598; R. v. Langriville, 10 B. & C., 899 ; R. v. Benneworth, 2 id., 755.) The case of Hughes v. Chatham (5 M. & G., 54), arose under the reform act, requiring a registry of voters, the statute requiring that the person should occupy as owner or tenant. The facts were, that a master rope-maker in a royal dock-yard had, as such, a house in the dock-yard for his residence, of which he had the exclusive use, without, paying rent, as part remuneration for his services, no part of it being used for public purposes. If he had not had it, he would have had an allow-, anee for a house, in addition to his salary. The case was elaborately argued, and thoroughly considered, and it was held, that the rope-maker occupied as a tenant,-and not as a servant. Findal, C. J., in delivering-the opinion of the court, said: “There is no inconsistency in the relation of master and servant with that of landlord and tenant. A master may pay his servant by conferring on him an-interest in real property, either in fee for years or at will, or for any other estate or interest, and if he do so the servant then becomes entitled to the legal incidents of the estate, as much as if it were purchased for any other consideration.” * * * “And, as there is nothing in the facts stated to show that the claimant was required to occupy the house for the performance of his services, or did occupy in order to their performance, or that it was conducive to that, purpose more than any house which he might have paid for in any other way than by his services; *227 and as the case expressly finds that he had the house as part remuneration for his services, we cannot say that the conclusion at which the revising barrister has arrived is wrong.”
I have cited the language of the court, because it lays down concisely the correct rule for determining the question involved in this class of cases, The question in the case before us is presented somewhat differently. Each party relied upon the terms of the contract, with only the additional facts that the house was a part of the mill property, and had been occupied for several years previously by the prisoner while engaged as a laborer in the mill. There was no request to submit the facts to the jury to determine whether the house was occupied to enable the prisoner the better to perform the service in which he was engaged; or, in other words, whether it was not occupied as an appendage to the mill, and really for the benefit of the owner; nor was there any evidence of an allowance for rent, but it was left to the court, upon the contract and facts before stated, to be determined as a question of law, and, in my judgment, the court decided correctly, that the defendant occupied as a servant, and not as a tenant. The inference from these facts is reasonable, if not irresistible, in the absence of any provision for an alllowance for rent, that the house was intended to be occupied by an employe for the benefit of the owner in carrying on the mill. The case thus presented is analogous to that of a person employing a coachman or gardener, and allowing or requiring him to reside in a house provided for that purpose on the premises; or a farmer who hires a laborer for wages, to work his farm, and live in a house upon the same. In these cases the character of the holding is clearly indicated by the mere statement of facts. It is not impossible that other facts may exist to strengthen or weaken the inference that the prisoner occupied as a servant, and not as a tenant, but from the facts proved there was no error in holding that he occupied as a servant. Both parties regarded it as a question of law upon substantially undisputed facts, although there are cases where the character of the holding is so uncertain, from conflicting *228 evidence or inferences which may be drawn, as to render it proper to submit the question to a jury. (3 M. & S., 790.)
It appears that the prisoner was absent at work when the prosecutor went, with his men, to the house to remove the furniture, etc., but soon returned and went to the wood-house, and came back with the axe in his hand, with which, afterward, the blow was inflicted. When the prisoner was upon the stand, as a witness, his counsel asked him the question: “What was your intention in taking the axe from the shed to the house?” To which there was an objection, which was sustained, and an exception taken. The General Term sustained this ruling upon the ground that it was too remote, and that the prisoner could only speak as to his intent at the time of striking the blow. I cannot concur with this view as applied to the question involved. The intent to kill was indispensable to be established by the prosecution. It constituted the vital-element of the offence, and although it is true that the time when that intent must exist was when the blow was struck, yet it was competent for the defendant to testify to any fact tending to disprove such intent. It is a fact to be established, and, of course, may be repelled. The prisoner having inflicted the injury with the axe, his previously going to the shed after it, was a circumstance bearing upon his intent in striking the blow, and from which an inference that he procured it for that purpose might be claimed to result. It was a legitimate circumstance to prove the fact of intent. If his taking the axe was not for that purpose, but for an innocent purpose, while it would not conclusively disprove the intent at the time of striking the blow, it would tend to destroy a material circumstance bearing upon that question against him. If he could disprove the intent, at the time of the act by a general denial, it follows that he might disprove any fact tending to establish it. His going to the shed for the axe would be immaterial, except for the purpose of showing that he brought it to be used as it was used, and if that purpose is disproved, it renders the circumstance of no moment. The rule is very well stated by Hogeboom, J., in *229 McKown v. Hunter. (30 N. Y., 625.) After citing 4 Kernan, 567; 21 New York, 121; 25 New York, 430, he says: “ These cases go very far to establish the general principle that when the motive of a witness in performing a particular act, or making a. particular declaration, becomes a material issue in a cause, or reflects important light upon such issue, he may himself be sworn in regard to it, notwithstanding the difficulty of furnishing contradictory evidence, and notwithstanding the diminished credit to which his testimony may be entitled as coming from the mouth of an interested witness.” The motive for procuring the ax was a fact material upon the principal fact in the case, and it was clearly competent for the prisoner to testify in respect to it.
We do not deem it necessary to notice the other points made. For this error the judgment must be reversed, and a new trial granted.
All concur; except Andrews and Miller, JJ., not voting.
Judgment reversed.